

Pillsbury Winthrop Shaw Pittman LLP
1650 Tysons Boulevard, Suite 1400 | McLean, VA 22102-4856 | tel 703.770.7900 | fax 703.770.7901

C. Joël Van Over
tel: 703.770.7604
joel.vanover@pillsburylaw.com

October 24, 2017

VIA EMAIL
Ms. Joo Chung
Director of Oversight and Compliance
ODCMO Directorate for Oversight and Compliance
4800 Mark Center Drive
ATTN: DPCLTD, FOIA Appeals, Mailbox #24
Alexandria, VA 22350-1700

Re:     Freedom of Information Act Appeal: Case Number 17-F-0593

Dear Ms. Chung:

Pillsbury Winthrop Shaw Pittman ("Pillsbury"), hereby appeals the September 6, 2017 revised final response made by the Department of Defense, OSD, and its OSD component, the Defense Human Resources Activity ("DHRA" or the "Agency") regarding Pillsbury's February 22, 2017 Freedom of Information Act ("FOIA") request.

We request that your office direct DHRA to produce all responsive documents properly releasable under FOIA and to revise their final response to the referenced FOIA request to provide sufficient information to permit a court to determine compliance with FOIA. This appeal is timely filed within 90 days of the September 6, 2017 final response. Our FOIA request and the FOIA office's final response are attached hereto for your reference. See Exhibit A attached hereto.

I.     BACKGROUND

Our FOIA request concerns the collection and analysis of data and information and the determinations made based upon that data and information to establish the 2017 Basic Allowance for Housing ("BAH") for Military Housing Areas ("MHAs") in New Jersey and Pennsylvania. As set forth in the referenced FOIA request, the MHA's covered by the FOIA request are: NJ 196, NJ 198, NJ 200, NJ 201, NJ 203, NJ 204, PA 248, PA 249, and PA 255. We note that the methodology and process for determining the BAH, in all MHAs, and the confidence level that is to be established in determining the BAH, is governed by the BAH Primer, a public document. A copy of the most recent version of the BAH Primer is

4817-7085-7292.v3     **Exhibit C**

Ms. Joo Chung
October 24, 2017
Page 2

attached hereto as Exhibit B.  The BAH Primer implements the governing statute, 37
U.S.C. § 403.

The Department of Defense ("DoD") is required by statute to determine the
BAH in all MHAs:

> The Secretary of Defense shall determine the costs of adequate
> housing in a military housing area in the United States for all
> members of the uniformed services entitled to a basic allowance
> for housing in that area. The Secretary shall base the determination
> upon the costs of adequate housing for civilians with comparable
> income levels in the same area.

37 U.S.C. § 403. The BAH program is run by the Defense Travel Management
Office ("DTMO"), a component of DHRA. DTMO defines the BAH as "a US-based
allowance prescribed by geographic duty location, pay grade, and dependency status.
It provides uniformed service members equitable housing compensation based on
housing costs in local civilian housing markets within the United States."[1]  See
DTMO website, screenshot attached hereto as Exhibit C.

DTMO uses contractor services, at least in part, to collect and provide rental
housing cost data for approximately 370 separate housing markets in the United
States, identified as Military Housing Areas ("MHAs").  An MHA includes rental
markets surrounding a duty station or a metropolitan area.  DTMO uses data provided
by the contractor to establish housing allowances, or BAH rates, for service members
living in rental housing within an MHA.  DTMO also collects and analyzes data from
other sources, and relies on active participation from Military Housing Offices
("MHOs") located in the MHAs.  The 2017 BAH Data Collection Process Guide,
which was prepared by the current contractor, states the following: "MHOs, familiar
with the intricacies of the rental housing market surrounding their respective
installations, help the BAH contractor, Robert D. Niehaus, Inc. (RDN), collect and
review the rental data that will directly impact the determination of fair and accurate
BAH rates." See Exhibit D at 1-1, attached hereto.  All of the data is sourced from
publicly available data. DTMO is responsible for collecting and analyzing sufficient
data to comply with the requirements of the BAH Primer, which it publishes on its
website.

According to the BAH Primer, which provides a detailed overview of how
housing allowances are to be determined, the BAH program evaluates data from
multiple sources, including local newspapers, real estate rental listings, apartment and

---

[1] http://www.defensetravel.dod.mil/site/bah.cfm

4817-7085-7292.v3

Ms. Joo Chung
October 24, 2017
Page 3

real estate management companies, local Government housing offices, and Fair
Market Rates published annually for all counties by the Department of Housing and
Urban Development.  The program analyzes six standard housing profiles when
determining BAH rates: 1) 1 Bedroom Apartment; 2) 2 Bedroom Apartment; 3) 2
Bedroom Townhouse/Duplex; 4) 3 Bedroom Townhouse/Duplex; 5) 3 Bedroom
Single Family Detached House; and 6) 4 Bedroom Single Family Detached
House.  Significantly, the BAH program is required to gather sufficient data to
achieve a "95% statistical confidence level that the estimated median rent is within
10% of the true median rent" in each MHA.  Exhibit B at Section 5.  This of course
cannot be achieved without analyzing the data, and ensuring that sufficient data is
gathered to support such a confidence level.

The Defense Travel Management Office website publishes "Frequently Asked
Questions"[2] (the "DTMO FAQs") and answers concerning how BAH is established.
See Exhibit E.  Excerpts from these FAQs are set forth below:

**17. What is the source of BAH rental data?**

Current, valid rental costs are crucial to accurate BAH rates. We use data from
multiple sources to provide a "checks and balances" approach. This ensures reliability
and accuracy. We obtain current residential vacancies from local newspapers and real
estate rental listings. We also contact apartment and real estate management
companies to identify units for rental pricing. We consult with real estate
professionals in each MHA to confirm market rental prices and obtain additional data.
Where available, we also contact fort/post/base housing referral offices and
installation leadership. We tap the local housing office knowledge and gain insights
into the concerns of our members. Current, up-to-date rental information from
telephone interviews and the internet is utilized from contacts provided by the local
housing offices. Properties are subjected to additional screening and validation
processes.

**18. What steps do you take to ensure reliability and accuracy of the data?**

In selecting specific units to measure, a multi-tiered screening process is employed to
ensure that the units and neighborhoods selected are appropriate. Every property to be
used is verified by telephone to ensure the correct rent and address are captured. The
property address is mapped to ensure it falls within the boundaries of the housing area
being sampled. In order to avoid sampling high-crime or other undesirable
neighborhoods, Military Housing Offices (MHO) have the ability to exclude certain

---

[2] http://www.defensetravel.dod.mil/site/faqbah.cfm#Q25

Ms. Joo Chung
October 24, 2017
Page 4

areas from data collection. In areas where the MHO has not identified exclusions, an income screening process, to identify appropriate neighborhoods, is used. For example, 3- and 4-bedroom single-family units are priced to set the rates for senior enlisted/officers, so 3- and 4-bedroom single family units are selected in neighborhoods where the typical civilian income is in the same range as senior enlisted/officers. When 1-bedroom apartments (junior single enlisted) neighborhoods are priced, focus is on where the typical civilian income is consistent with the income level that is typical for these grades. For comparison purposes, civilian salary equals the sum of military basic pay, average BAH, BAS, plus the tax advantage of the untaxed allowances.

**19. What housing costs are used to set BAH rates?**

BAH rates are computed using current median market rents and average local expenditures on utilities (electricity, water, sewer, and heating fuel) in each local market area, and will fluctuate as those costs change.

**20. How often do you collect housing data?**

The data is collected annually, in the spring and summer when housing markets are most active.

**21. What types of residences do you include in your data collection?**

The data include apartments, town homes/duplexes, as well as single-family rental units of various bedroom sizes.

In sum, all available information clearly and consistently describes the data collection and analysis that is undertaken to establish BAH rates annually. The FOIA requests at issue here concern only the collection of this data, the evaluation of data, and the recommendations that were based upon that data. The FOIA requests do not request any information concerning how the Department of Defense implements the BAH rates ultimately adopted. This process is governed by the Joint Travel Regulations (1 October 2017).[3] See Exhibit F.

On February 22, 2017, we submitted a Freedom of Information Act ("FOIA") request for documents related to the collection of data, the evaluation of data, and the calculation of the 2017 BAH by DTMO or its contractor, for the MHAs cited above.

---

[3] http://www.defensetravel.dod.mil/Docs/perdiem/JTR.pdf

Ms. Joo Chung
October 24, 2017
Page 5

Based upon DTMO's obligations to establish BAH rates, based upon diligent data collection and analysis, the FOIA requests at issue requested the following documents:

1. Copies of all anchor point data or other data submitted to DTMO (or its designee) by any contractor, including by Robert C. Niehaus, Inc., related to the determination of each 2017 BAH in each of the NJ-PA MHAs.

2. Documents sufficient to show the real estate professionals consulted by DTMO, its contractor(s), or others, the dates of such consultation, and the information provided as a result of such consultations, related to determining each 2017 BAH in each of the NJ-PA MHAs.

3. Copies of all analyses and reports related to market or other data submitted to DTMO (or its designee) by any contractor, including by Robert C. Niehaus, Inc., or by any Government entity (including a base housing office), related to the determination of each 2017 BAH in each of the NJ-PA MHAs.

4. Copies of all recommendations by any contractor, including by Robert C. Niehaus, Inc., related to the calculation or determination of each 2017 BAH in each of the NJ-PA MHAs.

5. A copy of each contract with each contractor, including Robert C. Niehaus, Inc., and modifications thereto, related to collecting or analyzing data pertaining to the determination of each 2017 BAH in each of the NJ-PA MHAs.

The DHRA, of which DTMO is a component part, purportedly found 27 documents, totaling 423 pages, deemed to be responsive to our FOIA requests. Of the 423 pages, only 296 were disclosed, and 127 pages were purportedly withheld based on FOIA Exemptions 4 and 6. Documents 26 and 27 were withheld in their entirety, and portions of documents 1-25 were withheld as well. The Agency failed to provide descriptions of the documents withheld and only gave a boilerplate reference to the statutory language for why these documents were withheld or redacted under Exemptions 4 and 6. The Agency neither explained nor provided any justification to support its reliance on Exemptions 4 or 6. Only conclusory references to the exemptions were noted in the FOIA response. Given that the data requested is publicly available data, and the analysis of such data is required by both the BAH Primer and statute, for example, and a determination on 2017 BAH rates was

Ms. Joo Chung
October 24, 2017
Page 6

completed almost a year ago, the Agency's reliance on these Exemptions, without explanation, is unreasonable.

It is important to note that the Agency has now issued two final responses to these FOIA requests. On July 19, 2017 DHRA issued a first final response indicating that a number of responsive documents were being withheld pursuant to FOIA Exemptions 4 and 6, but failed to identify what documents were being withheld and why. The Agency issued a revised final response on September 6, 2017, allegedly containing additional information about the documents withheld and the rationale behind the nondisclosure. However, instead of clarifying what has been withheld and why, the Agency simply repeated back to us language from our requests, and added more boilerplate references to the FOIA statute. Compare Exhibits A and G.

Significantly, the Agency provided no data or analyses and no substantive documents whatsoever that relate to how the BAH was determined for the relevant MHAs, as covered by FOIA requests 1-4 cited above. Remarkably, the Agency claims that information responsive to requests 3 and 4 does not exist, even though such information must exist since it is necessary to establish BAHs for the relevant MHAs, and those BAHs have been established. The only request to which the Agency partially responded is FOIA request number 5 above. Even though the Agency provided some documents purporting to be responsive to our requests, the information that was provided is not responsive. It therefore appears that all responsive documents have been withheld, although the Agency failed to adequately describe any of the withheld documents. In other words, the Agency's final response to the FOIA requests did not respond individually to each FOIA request, nor provide any basis for not responding to each FOIA request, other than reciting boilerplate and conclusory language for relying on Exemption 4 and 6, and claiming that responsive information does not exist. However, it is not possible that responsive documents do not exist, unless DHRA and DTMO did not collect or evaluate data, or recommend any BAH rates, as required by the BAH Primer and statute, the Defense Travel Regulation, as represented in the DTMO FAQ, and as required by the contract it entered into with RDN.

In sum, the Agency's withholding of responsive documents and its failure to articulate any basis for asserting a relevant exemption should reasonably be addressed in this appeal. To the extent it is not, the Agency will be required to do so in court. A court will not only require the Agency to demonstrate that its search was "reasonably calculated to uncover all relevant documents," but will also require the Agency to provide a Vaughn index, in which the Agency must explain the search method and process, identify all discovered documents, explain what records have been withheld, and provide justification for the withholding. *Weisberg v. U.S. Dep't of Justice*, 705

Ms. Joo Chung
October 24, 2017
Page 7

F.2d 1344, 1351 (D.C. Cir. 1983); *Vaughn v. Rosen*, 484 F.2d 820, 826-28 (D.C. Cir. 1973).

II.     **ARGUMENT**

FOIA favors disclosure, and as such, the burden is on the Government to prove that any withholding of records is covered by one of the nine exemptions. For the reasons discussed below, DHRA misapplied Exemptions 4 and 6 in response to our request, and inappropriately withheld responsive documents that should have been disclosed. DHRA should therefore be required to reassess its decision and disclose all relevant documents responsive to our requests.

A.     **DHRA's Duty to Disclose**

Agencies are under an affirmative obligation to disclose documents and records in response to FOIA requests. The Supreme Court has made it clear that FOIA's "strong presumption in favor of disclosure places the burden on the Agency to justify withholding any requested documents." *U.S. Dept. of State v. Ray*, 502 U.S. 164, 173 (1991). To that end, courts have held that FOIA "requires an Agency in possession of material it considers exempt from FOIA to provide the requestor with a description of each document being withheld, and an explanation of the reason for the Agency's nondisclosure." *Oglesby v. U.S. Dept. of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996). In order to provide the requestor with a "realistic opportunity to challenge the Agency's decision," the court in Oglesby instructed that "[t]he description and explanation the Agency offers should reveal as much detail as possible as to the nature of the document." *Id.* Furthermore, the FOIA statute provides that, "In denying a request for records, in whole or in part, an Agency shall make a reasonable effort to estimate the volume of any requested matter the provision of which is denied, and shall provide any such estimate to the person making the request." 5 U.S.C. § 552(a)(6)(F).

Here, DHRA's response to the FOIA request provided no details about the responsive documents other than to provide a conclusory boilerplate response that certain documents do not exist and other documents are being withheld based on Exemptions 4 and 6 of FOIA. Thus, because DHRA's response fails to give an adequate accounting of how many documents have been released and how many have been withheld, there is no way to know the extent of the Agency's nondisclosure. For example, the Agency's response indicates that 423 pages of material was identified as responsive to our requests, and according to the Agency's response letter, 379 of those pages are responsive to request 5, and 44 are responsive to requests 1 and 2. However when one adds up the total number of pages of documents disclosed as responsive to request 5, the DHRA only provided 296 of 379 responsive pages, with

Ms. Joo Chung
October 24, 2017
Page 8

no indication as to why the remaining 83 pages were withheld.  One document that
was provided, a 154 page contract, ends at page 113, with no explanation as to why
the rest was withheld, or indeed if it was intentionally withheld or was inadvertently
omitted.  See Exhibit H, attached hereto.  Another document ends at page 1 of 12, and
another at page 2 of 23.  Furthermore, when reviewing the documents that were
disclosed, and the number of pages that each document should have if complete, the
total comes out as 369 pages, not 379 as the DHRA indicates.  Due to the Agency's
failure to adequately identify and describe responsive documents, there is no way of
knowing if the total should be 379 as indicated in DHRA's response, or 369 as the
documents themselves indicate.  The failure to explain the basis for nondisclosure, or
the nature of withheld documents, or the number of withheld documents, or the
application of the exemptions that purportedly prevent disclosure is contrary to FOIA
requirements.  DHRA has not met its burden to establish that Exemptions 4 and/or 6
apply, and is unjustified in its withholding of responsive documents.  DHRA cannot
prevent a reasoned analysis of the merits of its decision to withhold responsive
documents simply by failing to provide any justification for its action, as it has done
here.  Ultimately, a court will require evidence sufficient to evaluate the merits of
DHRA's actions.  It is in all parties' interest to foster reasoned decision-making at the
administrative level, to avoid the cost and burdens of judicial review.  Given the
circumstances described in this appeal, there is no reasonable justification for
withholding not only any substantive document, but also withholding the facts that
assumedly underpin the Agency's assertion of Exemptions 4 and 6 on a blanket basis.
Accordingly, given the absence of any basis for denying disclosure, all responsive
documents should be provided.

Even assuming, arguendo, that any of DHRA's asserted FOIA exemptions
might be appropriate, which is disputed, FOIA also requires that agencies disclose
portions of responsive material that can be reasonably segregated from portions
withheld under an appropriate exemption.  FOIA provides the following:

> Any reasonably segregable portion of a record shall be provided to
> any person requesting such record after deletion of the portions
> which are exempt under this subsection. The amount of
> information deleted, and the exemption under which the deletion is
> made, shall be indicated on the released portion of the record,
> unless including that indication would harm an interest protected
> by the exemption in this subsection under which the deletion is
> made. If technically feasible, the amount of the information
> deleted, and the exemption under which the deletion is made, shall
> be indicated at the place in the record where such deletion is made.

Ms. Joo Chung
October 24, 2017
Page 9

5 U.S.C. § 552.  Courts have held the following regarding an Agency's duty to disclose reasonably segregable portions of responsive documents:

> FOIA focuses on information, not documents, and an Agency
> cannot justify withholding an entire document simply by showing
> that it contains some exempt material. The D.C. Circuit has long
> held that non-exempt portions of a document must be disclosed
> unless they are inextricably intertwined with exempt portions.
> Indeed, in light of this rule, categorical treatment raises doubt as to
> whether a document was properly reviewed for segregability.

*Pinson v. U.S. Dep't of Justice*, 202 F. Supp. 3d 86, 107 (D.D.C. 2016) (citations omitted) (internal quotation marks omitted).  Here, DHRA's response indicates that while 379 pages were determined to be responsive to our FOIA request, the Agency disclosed 296 of those pages.  By refusing to provide the withheld material, DHRA is not only claiming that all 83 withheld pages are non-disclosable under FOIA Exemption 4 or 6, but it is also claiming that not a single one of those 83 pages can be reasonably segregated and disclosed.  The Agency's decision to withhold 83 pages of documents in their entirety, raises serious doubts as to whether a segregability review was even performed at all.

DHRA has not met its burden to establish that Exemption 4 or 6 applies, and is unjustified in its withholding of responsive documents, or at the very least, is unjustified in its failure to provide reasonably segregable substantive information. Indeed, the wholesale withholding of documents appears designed to frustrate review.

B.  **DHRA Failed to Perform an Adequate Search**

Courts require agencies to perform FOIA searches that are "reasonably calculated to uncover all relevant documents." *See Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *see also Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (recognizing that an Agency has a duty to conduct a reasonable search for responsive documents).  Courts have frequently found Agency searches to be unreasonable when the Agency has failed to search files or databases where responsive records might have been located, and when the Agency improperly limited its search to certain record systems. *See Jefferson v. BOP*, No. 05-00848, 2006 WL 3208666, at *6 (D.D.C. Nov. 7, 2006) (finding search not reasonable when Agency searched only its central file system, where request warranted search of shared computer drives); *Oglesby* 920 F.2d at 68 (D.C. Cir. 1990) (holding that Agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested).  While it is not possible to point to specifics as to why DHRA's search was not reasonably calculated to uncover all relevant documents, this

Ms. Joo Chung
October 24, 2017
Page 10

is solely because DHRA failed to explain, in any detail, the method of the search.
Courts have consistently held that when an Agency fails to sufficiently describe the
search, there is no basis to determine that the search was adequate. *See Steinberg v.
Dep't of Justice,* 23 F.3d 548, 552 (D.C.Cir.1994) (finding the description of the
search inadequate when Agency failed to describe in any detail what records were
searched, by whom, and through what process); *Maydak v. U.S. Dept. of Justice*, 254
F. Supp. 2d 23, 39 (D.D.C. 2003) (finding it inadequate when Agency does not
describe retrieval methods or the various systems of records it maintains).

   The fact that DHRA provided no substantive documents clearly indicates that
its search was not reasonably calculated to uncover all relevant documents, which
should be maintained in one place as these are documents required by statute and
regulation to support a BAH determination.  BAH rates have been established and are
in effect.  Thus, it is clear that the search was unreasonable because, even though our
FOIA request provided specific information about the documents sought, DHRA
failed to produce anything that was responsive to our requests, despite the clear
evidence that documents in fact exist.  Not only did DHRA fail to provide relevant
documents that DTMO assuredly possesses, DHRA did not provide descriptions of
documents withheld, or explanations as to how and why they decided to withhold
them.

   Courts have found that when a request is clear as to the materials desired, an
Agency fails to conduct an adequate search if the Agency does not search files that
are likely to contain responsive records. *Truitt v. Dep't of State*, 897 F.2d 540, 544-46
(D.C. Cir. 1990). Our request was clear and specific, asking for documents pertaining
to MHAs in New Jersey and Pennsylvania.  We specifically asked for five categories
of documents, including copies of anchor point data, consultations with real estate
professionals, analyses and reports of market data, contractor recommendations, and
contracts with each contractor.  Moreover, as to the contractor data requested, the
solicitation that was incorporated into the contract issued to the contractor for the
purpose of gathering data relevant to establishing the BAH rates specifically requires
the contractor to provide rental data for each MHA, and to make that data available to
DTMO.  This is publicly available information that the contractor is paid to gather.
See Exhibit I, attached hereto, Solicitation at Section 4.  According to the solicitation
and the BAH Primer, DTMO is then supposed to analyze the data to establish a BAH
for each MHA.  DTMO must have received and analyzed data for the MHAs we
requested, because a BAH has been established for each of those MHAs.

   The Agency failed to provide responsive documents to all five requests, but
specifically claimed that documents responsive to requests 3 and 4 do not exist.
Requests 3 and 4 asked for the following:

Ms. Joo Chung
October 24, 2017
Page 11

3.    Copies of all analyses and reports related to market or other data
      submitted to DTMO (or its designee) by any contractor, including by
      Robert C. Niehaus, Inc., or by any Government entity (including a
      base housing office), related to the determination of each 2017 BAH in
      each of the NJ-PA MHAs.

4.    Copies of all recommendations by any contractor, including by Robert
      C. Niehaus, Inc., related to the calculation or determination of each
      2017 BAH in each of the NJ-PA MHAs.

Exhibit A.

       DHRA's response stated, "no documents of the kind you described in Items
3 and 4 could be identified," and then claimed that the search "could reasonably be
expected to produce the requested records if they existed." Exhibit A. The data we
requested must exist because the solicitation that was incorporated into the contract
specifically requires the contractor to provide DTMO with the data we requested,
namely market rental data for each MHA, and the contractor's recommendations
related to the calculation of BAH rates. See Exhibit I, attached hereto. The contract
solicitation provides the following:

The Contractor shall:

4.1 **Collect and analyze rental housing cost data for MHAs**. Use standard
methodology in collecting and analyzing data on a continuing basis to ensure
data accuracy and compatibility.

4.1.1  Collect housing costs for specific types of rental units  at each location
to include separate data covering average utilities (i.e. electricity, gas, oil,
water and sewer) and rental insurance.

4.1.2  Collect data representative of specific neighborhoods, as defined by sets
of ZIP Codes and Census Tracts specified by the Government. All rental
housing data shall be verified and apply to recent rentals only.

4.3  **Provide analyzed data and support information, reports, and
presentations** using the latest version of Microsoft Office Suite (including:
Access; Excel; MapPoint; PowerPoint; and Word), Census Boundary Bundle
and Claritas mapping software. The software type and version may be
changed if agreed to by both parties. **Submit data, information
electronically to the Contracting Officer's Representative (COR).**

Ms. Joo Chung
October 24, 2017
Page 12

Exhibit I at Section 4 (emphasis added).

The solicitation further provides that the contractor will: "Submit Audit reports that describe the results of the completed audits, including a log of meetings with housing professionals, a summary of the audit, and **recommendations** for further action." Exhibit I at Section 4. And the solicitation also provides that the contractor will: "Provide an Annual Summary Report that details the data collection methodology used, all deliverables, data sources and quality check methods; and **provides recommendations** and industry best practices for improving MHO data collection processes." DTMO must have received and analyzed data for the MHAs we requested because a BAH has been established for each of the NJ-PA MHAs. The solicitation requires that the contractor provide real estate professional information and contractor recommendations, but, while these documents must exist as per the contract requirements, DHRA has failed to produce any documents of this kind. Given that no such documents have been provided, or even described as redacted or withheld, shows that the search was inadequate because these documents must exist according to the Agency's own solicitation.

While FOIA request 4 cited above does not request the contractor's methodology, it does request all recommendations as they may pertain (generally or specifically) to the calculation or determination of the BAH in the NJ-PA MHAs. Again, the FOIA requests at issue involve the data and recommendations, and the determinations related to the NJ-PA MHA BAH rates. A determination must be a reasoned determination sufficient for judicial review under the Administrative Procedures Act, 5 U.S.C. § 706. The BAH rates themselves say nothing about how they were determined.

Furthermore, there is no reason to believe that a search for such documents would be unreasonably arduous, given that the contractor is required to create a searchable database containing rental data, and other BAH-related data, that can be filtered by MHA. The solicitation provides that the contractor will:

Receive, collect, log, and store rental data from MHOs in a database that includes property, real estate professional and census tract exclusion information. The database shall:

- Be accessible by MHOs and DTMO
- Have the ability to query submitted data by quantity and quality
- Provide copies of maps for MHOs to use in identifying the MHA boundaries
- Allow MHOs to input property and real estate professional information
- Allow MHOs to select census tracts for exclusion

Ms. Joo Chung
October 24, 2017
Page 13

Exhibit I at Section 4. The database is called the MHO Portal, and, according to Section 3 of the 2017 BAH Data Collection Process Guide, should contain much of the data we seek. See Exhibit D at Section 3.

Moreover, the Department of Defense is required by law to use the type of data we requested when determining BAH rates:

> The Secretary of Defense shall determine the costs of adequate
> housing in a military housing area in the United States for all
> members of the uniformed services entitled to a basic allowance
> for housing in that area. The Secretary shall base the determination
> upon the costs of adequate housing for civilians with comparable
> income levels in the same area.

37 U.S.C. § 403. Therefore, it cannot be reasonably assumed that DHRA's search was reasonable, or that the documents we seek do not exist, because establishing BAH rates for 2017 without analyzing data on comparable civilian housing would be inherently both arbitrary and capricious, and contrary to the law. Since the Government is generally entitled to an initial presumption that it acted reasonably, and given the requirement that the data and information sought must exist, it reasonably follows that the search by DHRA was inadequate.

In sum, it is clear that DHRA failed to conduct an adequate search for responsive materials, or at the very least, failed to adequately describe its search methods. We, therefore, request that the DHRA be directed to improve its search methods, and search again for documents responsive to our FOIA request, given the evidence that responsive documents exist.

### C.   DHRA Misapplied Exemption 4

DHRA's final response states that documents responsive to requests 1 and 2 are being withheld based on FOIA Exemption 4. In requests 1 and 2 we requested the following documents:

1. Copies of all anchor point data or other data submitted to DTMO (or its designee) by any contractor, including by Robert C. Niehaus, Inc., related to the determination of each 2017 BAH in each of the NJ-PA MHAs.

2. Documents sufficient to show the real estate professionals consulted by DTMO, its contractor(s), or others, the dates of such consultation,

Ms. Joo Chung
October 24, 2017
Page 14

and the information provided as a result of such consultations, related
to determining each 2017 BAH in each of the NJ-PA MHAs.

Exhibit A.  DHRA determined that two documents totaling 44 pages of material were
responsive to requests 1 and 2.  However DHRA also claims that all 44 pages of
responsive material are being withheld pursuant to Exemption 4.

FOIA Exemption 4 exempts the disclosure of: "trade secrets and commercial
or financial information obtained from a person and privileged or confidential."  5
U.S.C. § 552(b)(4).  In order for Exemption 4 to apply, DHRA must show that the
information withheld is: (1) trade secrets, or (2) information that is (a) commercial or
financial, and (b) obtained from a person, and (c) privileged or confidential.  *See*
*National Parks & Conserv. Ass'n v. Morton*, 498 F.2d 765, 766 (D.C. Cir. 1974).  In
addition, to rely upon Exemption 4, DHRA must assert and demonstrate that the
disclosure of the information and analysis provided by its contractors to perform their
federal contracts would likely cause substantial harm to the competitive position of
the contractor. *Id.*; *see also Critical Mass Energy Project v. NRC*, 975 F.2d 871 (D.C.
Cir 1992) (en banc), *cert. denied*, 113 S. Ct. 1579 (1993).  Since the FOIA requests
seek public information, and analyses of the public information provided to the
Government with the intent that DHRA rely on this information for its own
recommendations and ultimately the decision decisionmaking that led to the BAH
rates, on its face, this information does not satisfy the requirements of Exemption 4.

Finally, it is important to note that much of the information we seek is not
related to the contractor but the Agency, and concerns the Agency's evaluation and
analysis of data.  We seek to understand how the Agency used this data to determine
housing allowances, or if the Agency used the data at all.  Furthermore, as explained
in the BAH Data Collection Process Guide, much of the data we requested was not
actually collected by the contractor, but by Government employees in MHOs around
the country.  See Exhibit D.  Therefore, to the extent that we seek records of the
Agency's analysis and decision-making, as well as data that was collected by
Government employees in MHOs, Exemption 4 does not apply to those documents, as
they do not contain confidential information that would likely cause competitive
harm, but were provided by other Government employees or created by the Agency
itself.

           1.     Trade Secret

A trade secret for the purposes of Exemption 4 is defined as "a secret
commercially valuable plan, formula, process, or device that is used for the making,
preparing, compounding, or processing of trade commodities and that can be said to

Ms. Joo Chung
October 24, 2017
Page 15


be the end product of either innovation or substantial effort." *Pub. Citizen Health Research Group v. Food & Drug Admin.*, 704 F.2d 1280, 1288 (D.C. Cir. 1983).

The information we requested includes market rental data, and other similar public data that was used to establish the 2017 BAH in the MHAs cited above, in addition to information related to the contracts with each contractor that DTMO used to collect and provide such data. There is nothing about the data, or the contracts to collect the data, that would fall under Exemption 4's definition of trade secret. And the evaluation process to be used with the data is stipulated by the BAH Primer, and is public.

> 2.   Commercial or Financial Information, Obtained From a Person, and Privileged or Confidential

Given that the information requested is not trade secret information, in order to justify withholding responsive documents DHRA must show that the information falls under the second category of Exemption 4. To be protected, the information must be commercial or financial, obtained from a person, and privileged or confidential. The information requested must meet all of these elements to justify an Agency's nondisclosure under Exemption 4, and therefore a showing that the information does not meet any one of the elements is sufficient to compel disclosure.

> a.   Privileged or Confidential Information

When confidential information is required to be given to the Government, that information may be deemed confidential if its disclosure is likely to: (1) impair the Government's ability to obtain necessary information in the future; or (2) cause substantial harm to the competitive position of the person from whom the information was obtained. *Nat'l Parks*, 498 F.2d at 770. These are commonly referred to as the impairment prong and the competitive harm prong. Here, the impairment prong does not apply. Although information provided by a contractor may be required in the performance of the contract, contractors voluntarily enter into federal Government contracts and are compensated for their performance, and the Government acquires rights in all deliverables under the contract. The impairment prong of Exemption 4 requires that the Government make a showing that it will be impaired in its ability to acquire the information at issue in the future. There can be no such impairment here, since federal procurement regulations contemplate full and open competition, in circumstances applicable here, and offerors voluntarily compete for such contracts based upon their desire to do business with the Government and to be paid for their services. In sum, DHRA pays contractors to collect and supply public data, and to analyze such data. The BAH Primer states the following regarding the data collection effort: "We obtain current residential vacancies from local newspapers and real estate

Ms. Joo Chung
October 24, 2017
Page 16

rental listings. We also contact apartment and real estate management companies to identify units for rental pricing." Exhibit B. Rental data is by its nature public as are utility rates, and other relevant data. Finally, courts have held that the impairment prong only applies in limited situations in which disclosure of the information will affect the reliability of the information. See *Critical Mass*, 975 F.2d at 878. The disclosure and analysis of publically available information cannot make such information less reliable in the future. This is a non-sequitur.

The second prong of the test requires a showing that disclosing the requested information will result in substantial competitive harm to whoever provided the information, in this case the contractor. To establish competitive harm, DHRA must demonstrate that the contractor faces both actual competition, and a likelihood of competitive injury. *See Gulf & Western Industries v. United States,* 615 F.2d 527 (D.C.Cir.1979). Not only has DHRA failed to show actual competition or likelihood of injury, it is unreasonable to assume that such harm could result here. As noted, the information requested is market rental data and other similar data that is publically available, and is therefore already available to any potential competitors. Its analysis is largely in its collation and any simple analysis is governed by Government requirements. There is no secret sauce. Furthermore, the data we are requesting is essentially worthless to the contractor or to any competitor given that the data the contractor collected cannot be used in the future because it relates to last year's rental market and has already been used to establish this year's BAH rates.

In relation to contracts with the federal Government, courts typically look at whether the release of cost or pricing or similar information that was provided by a contractor will allow a competitor to calculate the contractor's future bids, enabling the competitor to undercut or underbid the contractor. *See Boeing Co. v. U.S. Dept. of Air Force*, 616 F. Supp. 2d 40, 45 (D.D.C. 2009); *see Nat'l Parks,* 498 F.2d at 770 (finding a likelihood of substantial competitive harm when disclosure would potentially enable competitors to underbid); *see also Public Integrity v. Department of Energy,* 191 F. Supp. 2d 187 (D.D.C. 2002) (where Agency failed to show that information would be of substantial assistance to competitors in estimating and undercutting bidders' future bids). Here, none of the data that we have requested could be used by a competitor to compete against the current contractor. The information requested is not related to cost or pricing data, but publically available rental data that is simply collected using standard means.

Moreover, in order to satisfy this second prong, DHRA must show that harm caused by the release of information will flow "from the affirmative use of proprietary information by competitors." *Pub. Citizen Health Research Group v. FDA,* 704 F.2d 1280, 1291 n.30 (D.C. Cir. 1983). Market rental data and other public data is clearly not proprietary information. In addition, courts have frequently

Ms. Joo Chung
October 24, 2017
Page 17

rejected claims of competitive harm when the claims were made solely by the Agency without input from the submitter of the information in question, in this case the contractor. *See Wiley Rein & Fielding v. U.S. Dep't of Commerce*, 782 F. Supp. 675, 676 (D.D.C. 1992) (rejecting competitive harm argument, and emphasizing that no evidence was provided to indicate that submitters objected to disclosure); *Newry Ltd. v. U.S. Customs & Border Prot. Bureau*, D.D.C. No. 04-02110, 2005 WL 3273975, at *4 (D.D.C. July 29, 2005) (rejecting competitive harm argument advanced solely by Agency). In DHRA's response, the Agency indicates that the determination to withhold information was made by "Mr. Correy Thomas, Information Governance Lead, an Initial Denial Authority for DHRA." See Exhibit A. There is no indication that the contractor is opposed to the release of this information, nor is there any evidence that DHRA contacted the contractor regarding this FOIA request, nor that the contractor has established any likely competitive harm with regard to virtually all relevant information requested.

Given that the information requested does not and cannot meet the requirements for nondisclosure under Exemption 4, the Agency must provide the documents requested in FOIA requests 1 and 2.

D.    **DHRA Misapplied Exemption 6**

In the Agency's final response, DHRA claims that its nondisclosure of documents responsive to requests 1 and 2 is also pursuant to FOIA Exemption 6, as well as Exemption 4 as discussed above. DHRA also cites Exemption 6 for its nondisclosure of documents responsive to request 5, in which we requested the following documents:

5.    A copy of each contract with each contractor, including Robert C. Niehaus, Inc., and modifications thereto, related to collecting or analyzing data pertaining to the determination of each 2017 BAH in each of the NJ-PA MHAs.

Exhibit A. Again, DHRA has incorrectly applied an FOIA Exemption, since there is no adequate justification for why the documents we requested in requests 1, 2, and 5 should be withheld based on Exemption 6.

FOIA Exemption 6 allows an Agency to withhold information that is: "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 6 requires DHRA to show that not only does the information withheld involve files of a personal, medical, or similar nature, but also that disclosure would clearly be an unwarranted invasion of personal privacy. Most significantly, we

Ms. Joo Chung
October 24, 2017
Page 18

requested no such information. The identity of the business from which DHRA or a contractor sourced information, does not fall within Exemption 6, and to the extent covered by the FOIA requests, this information should be provided[4].

The Supreme Court has instructed that, "Exemption 6 does not protect against disclosure of every incidental invasion of privacy - only such disclosures as constitute "clearly unwarranted" invasions of personal privacy." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 382 (1976). Furthermore, the 'personal privacy' element of this exemption applies only to actual people; courts have held that "corporations, businesses and partnerships have no privacy interest whatsoever under Exemption 6." *Washington Post Co. v. U.S. Dept. of Agric.*, 943 F. Supp. 31, 37 n. 6 (D.D.C. 1996). Therefore, to the extent that DHRA is relying on Exemption 6 to withhold information that affects the privacy of the contractor, or real estate companies that trade in public information, that reliance is inappropriate.

Here, all of the redactions in the disclosed documents are marked as relying on Exemption 6. For example, on the first page of the contract, the Agency redacted the contractor's address. See Exhibit H. However, because the information relates to a company and not an individual, reliance on Exemption 6 is inappropriate. *See id.* Moreover, given that the contractor's address can be found through a simple Google search, the Agency has no reason to redact this kind of information. Inasmuch as the information withheld pertains to the privacy of the contractor, a business entity and not an individual, the Agency's reliance on Exemption 6 is improper.

Not only has DHRA provided no justification whatsoever for invoking Exception 6, but much if not all of the material we requested already exists in the public domain. One document that was disclosed, in part, is the 154 page contract between the Agency and the contractor. However, the contract document that we were provided inexplicably stops at page 113 of 154, and is also heavily redacted. See Exhibit H. The document is a public contract that, in part, describes the type of data the Agency needs the contractor to collect, the scope of the work, the time in which the work is to be performed, names and addresses of the contractor and Government officials, and other such information. Barring pricing information which could arguably be redacted, there is no information in this public contract that is

---

[4] Although FOIA request number 2 requests real estate professionals, we are willing to stipulate that this includes only businesses and individuals acting on behalf of such businesses, and no personally identifying information is sought, for example, no contact information for individuals is sought. However, data and documents provided by any real estate business from Robert C. Niehaus, Inc. or from any other source, is responsive and would not reveal information protected by Exemption 6. DTMO would be required to know the source of data to know that the data or information is valid, and any such information should be provided.

4817-7085-7292.v3

Ms. Joo Chung
October 24, 2017
Page 19

confidential or that impacts the personal privacy of individuals. In fact, subsequent to submitting this FOIA request we were able to find the original 154 page solicitation online, which clearly shows all the information that DHRA decided to redact or withhold.

The fact that DHRA decided to withhold documents freely available online, shows the Agency's irrational and arbitrary decision-making, and the complete absence of any justification to withhold the information withheld. For example, in the portion of the contract that was disclosed to us, the Agency redacted names and addresses of Government employees and Government offices, while those very same names and address are publically available in the solicitation. Compare Exhibits H & I. Moreover, withholding this kind of information is wholly inappropriate. Generally, redactions of the names and contact information for Government employees is inappropriate given that courts have determined that Government officials have no expectation of privacy regarding their names, work contact information, titles, grades, and salaries. *See FLRA v. United States Dep't of Commerce*, 962 F.2d 1055, 1059-61 (D.C. Cir. 1992) (noting that performance awards containing names "have traditionally been subject to disclosure"); *Core v. United States Postal Serv.*, 730 F.2d 946, 948 (4th Cir. 1984) (finding no substantial invasion of privacy in information identifying names of successful federal job applicants); *Nat'l W. Life Ins. v. United States*, 512 F. Supp. 454, 461 (N.D. Tex. 1980) (discerning no expectation of privacy in names and duty stations of Postal Service employees).

In sum, there is no confidential information at issue here, and the analysis of information is statistical in nature, and does not involve specific personnel or persons. Rental data is not related to renters, and the only personal information at issue is entirely generic, related to the BAH rates applicable to different seniority levels or those categorized as individuals or families, not the names of personnel or family members. We have not requested any personal information whatsoever. And the names of Government decision makers are not confidential, and are routinely disclosed to ensure that decision-making can be tested as rational and reasonable, and in accordance with statutes and regulation and applicable directives. Moreover, Exemption 6 does not apply to businesses and other such entities, so any withheld information about the contractor, or about businesses from which the contractor collected data must be disclosed[5].

---

[5] We have no objection to the redaction of a contractors unit or hourly rate prices. The total contract values are public.

Ms. Joo Chung
October 24, 2017
Page 20

### III.   **CONCLUSION**

As discussed above, the Agency has failed to properly apply FOIA Exemptions 4 and 6 to the information requested in requests 1, 2, and 5, and as such, the Agency's reliance on Exemptions 4 and 6 to withhold documents responsive to our requests is inappropriate. Further, even if the Agency had any reasons for relying on these exemptions in the first instance, it has failed to adequately explain those reasons in a way that would provide a requestor with a realistic opportunity to challenge the decision to withhold. The Agency has also failed to conduct an adequate search in relation to all five requests, and especially in relation to requests 3 and 4, since the contract and the BAH primer require not only that these documents exist, but that they be made available to DTMO in a readily searchable format. We, therefore, request that the Agency disclose all documents responsive to our February 22 request, and that it conduct an adequate search to ensure that all such responsive documents are identified and provided. Based on the foregoing, it is clear that there is no justification for withholding any documents responsive to the FOIA requests here, and they should be provided promptly.

Very truly yours,

C. Joël Van Over

Enclosures